## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

Robert L. and Rebecca A. Shields, individually, and on behalf of all individuals and legal entities similarly situated,

     Plaintiffs

vs.

Stone Hill Minerals Holdings, LLC, EQT TGHL Exploration, LLC, EQT TGHL Exploration II, LLC, EQT TGHL Holdings Midco, LLC and Tug Hill Operating, LLC,

     Defendants

ELECTRONICALLY FILED

Mar 01 2024

U.S. DISTRICT COURT
Northern District of WV

Case No.:_____  **5:24-CV-39 (Bailey)**

## COMPLAINT

COME NOW Robert L. and Rebecca A. Shields, individually, and as representatives of those individuals, entities, companies similarly situated (the "putative Class") and for their complaint state as follows:

### I.

### PARTIES

1. Robert L. and Rebecca A. Shields ("Shields") are individuals married to each other and residing in West Virginia.

2. Stone Hill Minerals Holdings, LLC ("Stone Hill") is a Delaware limited liability company doing business in West Virginia with its principal place of business in Texas.  Its agent for service of process is Capitol Services, Inc. 108 Lakeland Ave., Dover, DE 19901.

3. EQT TGHL Exploration, LLC is a Texas limited liability company doing business in West Virginia with its principal place of business in Pennsylvania.  It is the successor-in-interest to TH

Exploration, LLC, formerly a Texas limited liability company doing business in West Virginia with its principal place of business in Texas.  Its agent for service of process is CT Corporation System, 5098 Washington St. W., Suite 407, Charleston, WV 25313-1561.

4.    EQT TGHL Exploration II, LLC is a Texas limited liability company doing business in West Virginia with its principal place of business in Pennsylvania.  It is the successor-in-interest to TH Exploration II, LLC, formerly a Texas limited liability company doing business in West Virginia with its principal place of business in Texas.  Its agent for service of process is CT Corporation System, 5098 Washington St. W., Suite 407, Charleston, WV 25313-1561.

5.    EQT TGHL Holdings Midco, LLC is a Delaware limited liability company doing business in West Virginia with its principal place of business in Texas.  It is the successor-in-interest to THQ Appalachia I Midco, LLC, formerly a Texas limited liability company doing business in West Virginia with its principal place of business in Texas.  Its agent for service of process is The Americas, 251 Little Falls Drive, Wilmington, DE 19808.

6.    Tug Hill Operating, LLC is a Texas limited liability company doing business in West Virginia with its principal place of business in Texas.  Its agent for service of process is CTC, 1627 Quarrier St., Charleston, WV 25311-2124.

## II.

## <u>JURISDICTION AND VENUE</u>

7.    This Court has jurisdiction over this matter pursuant to:

a.    28 U.S.C. §1332, as there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs; and

b.    The Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d).  Upon information and belief, CAFA's requirements are satisfied in that (1) the members of the Class exceed

100; (2) the citizenship of at least one proposed Class member is different from that of Defendants; and (3) the matter in controversy, after aggregating the claims of the Members of the putative Class, exceeds $5,000,000.00, exclusive of interest and costs.

8.      This Court has personal jurisdiction over all Stone Hill, which is or at all relevant times was doing business in the Northern District of West Virginia.

9.      Venue of this matter is proper in the Northern District of West Virginia.

10.      *Southern Country Farms vs. TH Exploration, LLC et al.*, Case 5:21-cv-00084-JPB-JPM was filed in the United States District Court for the Northern District of West Virginia.  Claims made in this litigation arise from and touch upon the factual predicate of the Southern Country case.  Thus, the two are related matters.

### III.

### THE SHIELDS OIL & GAS LEASES

11.      The Shields granted two Oil & Gas leases to Gastar Exploration USA, Inc. on March 10, 2008, covering 250.11 acres of land, more or less, located in Marshall County, West Virginia (the "Leases").  The Leases are recorded in Book 669, Page 354 and 360 of the Marshall County records.  A copy of each is attached as Exhibit 1 and 2.

12.      The Leases were drafted by Gastar Exploration USA, Inc. ("Gastar").

13.      Upon information and belief, effective September 1, 2010, Atinum Marcellus I, LLC ("Atinum") acquired a 50% non-operating working interest in the Leases.

14.      Effective January 1, 2016, THQ Appalachia I, LLC (now known as EQT TGHL Holdings Midco, LLC) acquired Gastar's interest in the Leases and assigned them to its wholly owned subsidiaries, TH Exploration, LLC (now known as EQT TGHL Exploration, LLC) and/or TH Exploration II, LLC (now known as EQT TGHL Exploration II, LLC) and operated the Leases

through their affiliate, Tug Hill Operating, LLC.  These entities are collectively referred to herein as "Tug Hill".

15.    Effective July 1, 2020, Tug Hill acquired all of Atinum's interest in the Leases.

16.    In or around September 2023, the Tug Hill entities were acquired by the EQT TGHL entities named as defendants.

**IV.**

**STONE HILL ACQUISITION OF THE SHIELDS' INTEREST**

17.    By letter dated March 16, 2020, Stone Hill made an unsolicited offer to purchase the Shields' mineral interests in approximately 58.19 net mineral acres located in Marshall Country, West Virginia.

18.    Stone Hill was at all relevant times an affiliate of Tug Hill.  At the time of the offer, Tug Hill was the lessee of the Shields' Leases and the operator of the wells drilled on the Shields' Leases.  Upon information and belief, Stone Hill was provided access by Tug Hill to confidential information maintained by Tug Hill relating to its lessors, including but not limited to the Shields, in West Virginia, the production from and production plans for its lessors' Leases in West Virginia and the royalties relating to its lessors' Leases in West Virginia, all without the consent or knowledge of its lessors, including the Shields.

19.    The Shields did not reply to the March 16, 2020 offer from Stone Hill.  Stone Hill sent a second unsolicited offer letter to the Shields, dated January 21, 2021, to which the Shields also did not reply.

20.    At the time of the January 21, 2021 offer, the Shields were entitled to and receiving royalties for production from approximately 10 wells located on the Shields well pad (the "Shields wells").

4

21.    The public production records of the West Virginia Department of Environmental Protection (WVDEP) reflect that all 10 wells on the Shields pad (1H-10H) were shut in and ceased producing beginning in April 2021 and only resumed production in September or October of 2022. The Shields were not informed of the reason for the wells being shut in or when production was anticipated to resume.

22.    By letters dated April 13, 2021, June 25, 2021, September 3, 2021, October 6, 2021 and October 29, 2021, Stone Hill made additional unsolicited offers to purchase the Shields' mineral interests in Marshall Country, West Virginia.  These subsequent offers increased the mineral acres sought to be purchased.

23.    During the time when these offers were made to the Shields by Stone Hill, Tug Hill was drilling numerous wells on the Shields' Leases and had plans to drill numerous additional wells. Specifically, during the relevant time period, in addition to the Shields wells, Tug Hill was drilling the McMasters and Whistlepig wells.

24.    Regarding the McMaster wells:

    a.   The McMasters N-11HU was spudded 6/8/2021 and completed 8/9/2022.

    b.   The McMasters N-12HU was spudded 6/4/2021 and completed 8/11/2022.

    c.   The McMasters N-13HU was spudded 6/3/2021 and completed 8/19/2022.

    d.   The McMasters N-14HU was spudded 6/9/2021 and completed 7/22/2022.

    e.   The McMasters N-15HU was spudded 6/5/2021 and completed 7/22/2022.

25.    All of the McMasters wells began reporting production in September or October of 2022. The McMasters 13HU and 14HU pass directly through the Shields' property.

26.    Regarding the Whistlepig wells:

    a.   The Whistlepig N-4HM was spudded 7/12/2019 and completed 11/13/2021.

b.  The Whistlepig N-5HM was spudded 7/6/2019 and completed 11/22/2021.

c.  The Whistlepig N-6HM was spudded 7/10/2019 and completed 11/22/2021.

d.  The Whistlepig S-7HM was spudded 7/2/2019 and completed 12/11/2021.

e.  The Whistlepig S-8HM was spudded 7/8/2019 and completed 12/12/2021.

f.  The Whistlepig S-9HM was spudded 7/4/2019 and completed 12/12/2021.

27.    All of the Whistlepig North and South wells began reporting production in January 2022.

28.    Upon information and belief, Stone Hill had access to and was aware of the Tug Hill drilling program and reserve estimates.

29.    Upon information and belief, Stone Hill, acting in concert with Tug Hill, accelerated its efforts to acquire mineral interests and rights at a time when it would appear to the Shields, and the putative Class, that production was slowing and the value of their mineral rights and interests was substantially decreased.

30.    After receipt of the October 29, 2021 offer letter, the Shields decided to sell a portion of their interest in their Leases.  Stone Hill sent a representative to the Shields' home where a deed dated March 3, 2022 was executed conveying 50% of the Shields' interest in the Shields' Leases to Stone Hill (the "Mineral Deed").

31.    Significantly, the Mineral Deed provided that Stone Hill would receive all royalties for production after January 14, 2022.  Although the Whistlepig began producing in January 2022, no royalties had yet been paid out for the production from those wells by Tug Hill to the Shields and other royalty owners.  Instead, the royalties were being held "in suspense" by Tug Hill for the benefit of the Shields and the other lessors.  Tug Hill acted as a fiduciary or trustee with regard to the royalties being held "in suspense."

32.     Upon information and belief, when the Shields executed the Mineral Deed in favor of Stone Hill, Tug Hill was holding over $100,000 in suspense for the 50% interest sold by the Shields to Stone Hill.

33.     Upon information and belief, at all relevant times prior to purchasing the mineral rights and/or interests of the Shields, and the putative Class, Stone Hill was aware royalties owed to the Shields were being held in suspense and the amount held in suspense.  As a result, Stone Hill misrepresented the effective amount of consideration being offered for their mineral rights and/or interests.

34.     The Shields were not aware of any royalties being held in suspense and they were not informed of the royalties being held in suspense by either Tug Hill or Stone Hill.  In effect, Stone Hill partially paid for the Shields' 50% mineral interest with the Shields' own money.

35.     At no time prior to the Shields' execution of the March 3, 2022 Mineral Deed did Stone Hill disclose to the Shields that it was affiliated with Tug Hill or its knowledge of the Tug Hill drilling program and production plans or the royalties being held in suspense for the Shields.  Had they been informed of these facts, they would not have sold their 50% interest.

36.     As a result of the Mineral Deed, the Shields ultimately gave up a 50% interest in approximately 6 Whistlepig Wells, 10 wells in the Shields Unit, 8 wells in the McMasters Unit and 13 wells in the Old Crow North Unit.  Upon information and belief, the royalty payments for the 50% interests have already equaled or exceeded the amount paid by Stone Hill.

**V.**

**<u>SOUTHERN COUNTRY LAWSUIT</u>**

37.     On or about June 3, 2021, Southern Country Farms, Inc. ("Southern Country") filed a lawsuit in the United States District Court for the Northern District of West Virginia against Tug

7

Hill and Atinum alleging that it had entered into an oil and gas lease with Gastar, which was subsequently acquired by Atinum and Tug Hill and that the royalties due under its lease were not paid in accordance with the terms of the lease and West Virginia law.  The lawsuit was styled *Southern Country Farms, Inc. v. TH Exploration, LLC*, et al, Cause No. 5:21-cv-84 ("Southern Country Lawsuit").  Southern Country sought certification as a class action.

38.    On March 23, 2023, the District Court entered an order in the Southern Country Lawsuit (the "Southern Country Class Certification Order") certifying the following Class (the "Southern Country Class"):

> All current lessors, who own a royalty interest, or a right to a royalty interest, in or to an oil and gas mineral lease, in which any of the defendants ever owned an interest, covering property located in West Virginia with royalty clauses providing in substance the following royalties:

> (a) on oil (including but not limited to distillate and condensate) One eighth (1/8) of that produced and saved from the lease premises, the same to be delivered at the wells or to the credit of Lessor in the pipeline to which the wells may be connected, provided; however, Lessee, at their option, may from time to time purchase the royalty oil, paying not less than the price prevailing in the pricing area for oil of like grade and gravity at the time of delivery;

> (b) on gas, including casinghead gas and all other gaseous or vaporous substances, produced from the Land and sold or used off the lease premises or in the manufacture of gasoline or in the extractions of sulphur or any other product, the market value at the wells of One-eighth (1/8) of the gas sold or used, with the market value at the wells in no event to exceed the net proceeds received by Lessee calculated or allocated back to the wells from which produced, making allowance and deduction for a fair and reasonable charge for gathering, compressing, and making the gas merchantable, . . .

39.    The Leases included in the Southern Country Class are referred to as the "Southern Country Class Leases."  The Class included only those lessors who owned a royalty interest as of March 23, 2023 when the Class was certified.

8

40.     The Shields were/are members of the Southern Country Class for the interest they retained in their Leases but not for the 50% interest they sold to Stone Hill.  Stone Hill did not disclose to the Shields that the Mineral Deed would endanger (and 19 days later, upon final class certification, terminate) the Shields' membership in the Southern Country Class as to the 50% assigned to Stone Hill.

41.     In or around mid-September 2023, EQT Corporation acquired Tug Hill and its related assets, including the Shields' Leases.

42.     On or about September 13, 2023, a Settlement was reached in the Southern Country Lawsuit between Tug Hill/EQT and the Class (the "Southern Country Settlement").

43.     On November 13, 2023, the District Court granted preliminary approval of the Southern Country Settlement.

44.     In February 2024, the District Court granted final approval of the Southern Country Settlement.

45.     At no time prior to the Shields' execution of the March 3, 2022 Mineral Deed in favor of Stone Hill did Stone Hill disclose to the Shields that Tug Hill was improperly deducting costs before calculating the royalties due to the Shields under their Leases, thus reducing the amount of royalty being paid to them, or that such a claim was being asserted against Tug Hill.

46.     At no time prior to the Shields' execution of the March 3, 2022 Mineral Deed in favor of Stone Hill did Stone Hill disclose to the Shields that a Class action lawsuit had been filed against Tug Hill which, if certified, would include the Shields' Leases and which alleged that Tug Hill was improperly deducting costs before calculating the royalties due to the Shields under their Leases, thus reducing the amount of royalty being paid to them.

**VI.**

## CLASS ACTION ALLEGATIONS

47.     The Class in the Southern Country Lawsuit excluded those former lessors of the Southern Country Class leases who no longer held an interest in those leases as of March 23, 2023. Upon information and belief, the unpaid royalties due for the period of the former lessors' ownership was the personal property of the former lessors and was due and owing. Tug Hill converted those funds to its uses and did not hold these amounts in suspense.

48.     Stone Hill acquired the interests of numerous lessors in the Southern Country Class leases prior to March 23, 2023 through Mineral Deeds with identical or substantially similar language in all relevant respects.

49.     Upon information and belief, Stone Hill did not acquire the personal property rights of those former owners for unpaid royalties due for the period of the former lessors' ownership of the Southern Country Class leases.

50.     As alleged below, if the Court in this case concludes that Stone Hill did not acquire the personal property rights of those former owners for unpaid royalties due for the period of the former lessors' ownership of the Southern Country Class leases, then the Shields, on behalf of themselves and all others similarly situated, seek certification of two Class: one to recover those unpaid royalties from the Tug Hill defendants ("Tug Hill Class") and the other to recover damages from Stone Hill and the Tug Hill defendants in connection with Stone Hill's acquisition of interests in the Southern Country Class leases ("Stone Hill Class").

51.     As alleged below, if the Court in this case concludes that Stone Hill did acquire the personal property rights of those former owners for unpaid royalties due for the period of the former lessors' ownership of the Southern Country Class leases, then the Shields, on behalf of themselves and all others similarly situated, seek certification only of the Stone Hill Class which

10

would include as damages the unpaid royalties due for the period of the former lessors' ownership of the Southern Country Class leases.

## VII.

## TUG HILL CLASS

52.    The Shields bring this action on behalf of themselves and all others similarly situated and are members of, and seek to represent, a class of persons and legal entities defined as:

All lessors who would have been a member of the Southern Country Class but for having sold all or part of their interest in a Class Lease prior to the March 23, 2023 date of the Southern Country Class Certification Order.

Excluded from the Class are:

a.   With the exception of the foregoing, all parties excluded from the Southern Country Class in the Southern Country Class Certification Order.

### Numerosity of the Class

53.    Upon information and belief, the members of the putative Class are so numerous that joinder of all members is impracticable.  The records of Marshall County, West Virginia alone reflect that Stone Hill acquired interests in over 1,000 oil and gas leases covering property located in West Virginia since 2016.  Upon information and belief, at least 100 or more are interests in leases that would have been included within the Southern Country Class except that some or all of the interests were transferred prior to March 23, 2023.  The Class Members are identifiable using methods of assessment and/or records maintained in the ordinary course of business by Tug Hill and/or Stone Hill.  Notice may be provided to the Class Members by publication, first-class mail and/or other means.

### Commonality

54.    Common questions of law and fact exist as to all Class Members and predominate over questions affecting individual Class Members.  Among the questions of law and fact common to the putative Class are:

a.    Whether the royalty statements sent by Tug Hill, and its predecessors, to their lessors were and are misleading;

b.    Whether Tug Hill, and its predecessors, sold the production from the subject leases to a true arms-length third party purchaser for a true market value;

c.    Whether Tug Hill, and its predecessors, have improperly charged costs to their lessors;

d.    Whether Tug Hill, and its predecessors, have taken improper deductions for royalty on oil distillates and condensate;

e.    Whether the provision for royalty on gas is ambiguous;

f.    Whether Tug Hill, and its predecessors, have taken improper deductions for royalty on gas; and

g.    Whether Tug Hill, and its predecessors, have paid royalty on the full volume of oil and gas produced from the leases.

Tug Hill is expected to raise common defenses to these claims.

55.    Many, if not all, of these common issues were decided in the Southern Country Lawsuit by the Order issued on June 14, 2023.

<u>Typicality</u>

56.    The claims of the Shields are typical of the claims of the Class.  Furthermore, the factual bases of Tug Hill's and its predecessors' misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all members of the Class.  The Shields have been damaged by the same wrongful conduct of Tug Hill and its predecessors and suffered injuries similar in kind and degree to the injuries suffered by all putative Class Members. The Shields make the same claims and seek the same relief for itself and for all Class Members.

<u>Adequacy of Representation</u>

57.     The Shields will fairly and adequately represent and protect the interests of the Class.  The Shields have retained counsel with substantial experience in prosecuting complex class actions.  Neither the Shields nor its Counsel have interests adverse to those of the Class.

### Superiority of Class Action

58.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Without a class action, individual Class Members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights.  Because of the ratio of the economic value of the individual Class Members' claims in comparison to the high litigation costs in complex cases such as this, few could or would likely seek their rightful legal recourse.  Absent a class action, Class Members will continue to incur harm without remedy.

59.     Moreover, prosecuting separate actions by individual Class Members would create a risk of (A) inconsistent or varying adjudications with respect to individual Class Members and/or (B) adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

60.     The Shields know of no difficulty that will arise in the management of this litigation that would preclude its maintenance as a class action.

61.     Tug Hill has acted, or refused to act, on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

### Pre-Suit Notice

62.     The Shields' Leases contains a notice provision which provides in relevant part:

Breach or Default. In the event Lessor considers that Lessee has not complied with the express or implied obligations of this Lease, Lessor shall notify Lessee in writing of the facts relied on as constituting a breach of the obligations. Lessee shall then have sixty (60) days after receipt of that notice within which to meet or commence to meet all or any part of the breaches alleged by Lessor. The service of the notice shall be precedent to the bringing of any action by Lessor for any cause, and no action shall be brought until the lapse of sixty (60) days after service of the notice on Lessee....

63.    Without conceding the enforceability of this provision, prior to filing the Southern Country Lawsuit, Southern Country served Tug Hill with written notice of its breaches by letter dated March 1, 2021. See Exhibit 3. Tug Hill replied by letter dated April 14, 2021. See Exhibit 4. In its reply letter, Tug Hill stated that it had paid the proper amount of royalties, it had not charged any costs, directly or indirectly, to Southern Country and that it was entitled to charge some costs if it decided to do so. Tug Hill continued to take this position in the Southern Country Lawsuit.

64.    Assuming the leases given by the putative Class Members contain a similar provision and the provision is enforceable, it is not necessary for the Class Members to provide such notice to Tug Hill as it would be a vain and useless act not required by the law. Tug Hill has already denied the same claims in response to Southern Country's notice and in the Southern Country Lawsuit. For this reason, further notice by Class members was not required in the Southern Country Lawsuit.

## CAUSES OF ACTION

### Count I

### Breach of Contract

65.    The Shields incorporate the preceding paragraphs of this Complaint as though fully stated here.

14

66.    Tug Hill, and its predecessors, deducted costs and expenses before calculating the Shields' royalties, and the royalties of the putative Class, not permitted by its Lease.  Tug Hill, and its predecessors, also failed to pay royalties for significant volumes of oil, gas and associated products taken from the Shields' leasehold and that of the putative Class.

67.    Tug Hill, and its predecessors, materially breached their lease obligations to the Shields, and the putative Class, including express and implied covenants, including, but not limited to, the following:

    a.  Failing to disclose and/or providing inaccurate and misleading information about the gathering, transporting, processing and selling of oil, gas and associated products produced from the Shields' Leases and the leases of the putative Class members;

    b.  Failing to sell the gas, as defined by the gas royalty clause of the Shields' Leases and the leases of the putative Class members to a true third-party in an arms-length transaction;

    c.  Failing to sell the oil, distillates condensate and distillate, as defined by the oil royalty clause of the Shields' Leases and the leases of the putative Class members at the price prevailing in the pricing area for oil of like grade and gravity at the time of delivery;

    d.  Taking significant volumes of oil, gas and associated products produced from the Shields' Leases and the leases of the putative Class members without paying royalties on them;

    e.  Improperly deducting, directly or indirectly, costs on oil, gas and associated products produced from the Shields' Leases and the leases of the putative Class members from royalties paid under those leases;

15

f.  Failing to pay royalties on the oil, gas and associated products produced from the Shields' Leases and the leases of the putative Class members based upon the true market value of such production;

g.  Failing to sell the oil, gas and associated products produced from the Shields' Leases and the leases of the putative Class members and pay royalties on such production in a manner consistent with the lease(s), the reasonably prudent operator standard and West Virginia Law; and

h.  Other breaches as will be shown at the trial of this matter.

68.    The Shields, and the putative Class, have sustained and continues to sustain pecuniary loss due to these breaches.

69.    The Shields, and the putative Class, have complied with every element of their respective contractual obligations, implied or express.

70.    The Shields, and the putative Class, are entitled to Tug Hill's performance of express contractual obligations and implied covenant obligations.

71.    Tug Hill's and its predecessors' breaches of contractual obligations, singularly and/or in any combination, have caused significant financial damages to the Shields, and the putative Class, and/or conferred unjust and unearned benefits on Tug Hill.  The Shields, on behalf of themselves and the putative Class, now seek all damages to which they, and the putative Class members, are entitled, including consequential and incidental damages, lost profits, out-of-pocket losses, compensatory, punitive and future damages.

**WHEREFORE**, the Shields, and the putative Class, demands judgment in an amount to be determined along with all other appropriate damages in law or equity, including pre-judgment interest, post-judgment interest, compensatory damages, punitive damages and attorneys' fees.

16

**Count II**

**Accounting**

72.     The Shields incorporate the preceding paragraphs of this Complaint as though fully stated

here.

73.     The Shields, and the putative Class, are entitled to an accounting from Tug Hill of:

   a.  All volumes of oil, gas and associated products produced from their and the putative
       Class' leases;

   b.  The manner and contractual arrangements by which such production was marketed and
       sold;

   c.  The manner in which royalties were calculated for the leases at issue;

   d.  All costs charged to the royalty owners, directly and indirectly;

   e.  The volumes of such production upon which royalty was paid;

   f.  All other matters to which the Shields, and the putative Class, are entitled to an
       accounting under their leases and West Virginia law.

   **WHEREFORE**, the Shields, and the putative Class, demand an accounting as specified herein.

**VIII.**

**STONE HILL CLASS**

74.     The Shields bring this action on behalf of themselves, and all others similarly situated and is

a member of, and seeks to represent, a class defined as:

> All persons or entities from whom Stone Hill Minerals Holding, LLC, or any
> affiliate of Stone Hill Minerals Holding, LLC, acquired an interest or right to an
> interest in an Oil & Gas Leases covering property located in West Virginia in which
> TH Exploration, LLC, TH Exploration II, LLC or any affiliated entity had acquired
> an interest, or which was operated by Tug Hill Operating, LLC.

> Excluded from the Class are:

>   a.  The members of Stone Hill Minerals Holding, LLC, or any affiliate of Stone
>       Hill Minerals Holding, and their immediate family;

>   b.  Any judge or judicial personnel assigned to this case and their immediate
>       family; and

17

    c.  Any legal representative, successor or assignee of any excluded person or entity.

Numerosity of the Class

75.    The members of the putative Class are so numerous that joinder of all members is impracticable.  The records of Marshall County, West Virginia alone reflect that Stone Hill acquired interests in over 1,000 oil and gas leases covering property located in West Virginia since 2016 and, upon information and belief, over 100 of those leases qualify under the proposed class definition.  The Class Members may be identified using methods of assessment and/or records maintained in the ordinary course of business by Stone Hill.  Notice may be provided to the Class Members by publication, first-class mail and/or other means.

Commonality

76.    Common questions of law and fact exist as to all Class Members and predominate over questions affecting individual Class Members.  Among the questions of law and fact common to the putative Class are:

    a.  Whether Stone Hill used its position as an affiliate of Tug Hill to obtain internal Tug Hill information and use such information in the purchase of the Class members' mineral interests or rights.

    b.  Whether Stone Hill had information about Tug Hill's drilling program prior the purchase of the Class members' mineral interests or rights.

    c.  Whether Stone Hill had information about Tug Hill's reserve estimates prior the purchase of the Class members' mineral interests or rights.

    d.  Whether Stone Hill had information about royalties held in suspense by Tug Hill prior the purchase of the Class members' mineral interests or rights.

    e.  Whether Stone Hill had a duty to disclose the internal information obtained from Tug Hill to the Class members prior to purchasing their mineral interests or rights.

f.  Whether Stone Hill had a duty to disclose the internal information about Tug Hill's deducting of costs before calculating royalties to the Class members prior to purchasing their mineral interests or rights.

g.  Whether Stone Hill had a duty to disclose the information about the Southern Country Lawsuit to the Class members prior to purchasing their mineral interests or rights.

h.  Whether Tug Hill conspired with Stone Hill in the foregoing.

Stone Hill and Tug Hill are expected to raise common defenses to these claims.

<u>Typicality</u>

77.    The claims of the Shields are typical of the claims of the Class.  Furthermore, the factual bases of Stone Hill and Tug Hill's misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all members of the Class.  The Shields have been damaged by the same wrongful conduct of Stone Hill and Tug Hill and suffered injuries similar in kind and degree to the injuries suffered by all putative Class Members.  The Shields make the same claims and seek the same relief for itself and for all Class Members.

<u>Adequacy of Representation</u>

78.    The Shields will fairly and adequately represent and protect the interests of the Class.  The Shields have retained counsel with substantial experience in prosecuting complex class actions.  Neither the Shields nor their Counsel have interests adverse to those of the Class.

<u>Superiority of Class Action</u>

79.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Without a class action, individual Class Members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights. Because of the ratio of the economic value of the individual Class Members' claims in comparison to the high

litigation costs in complex cases such as this, few could or would likely seek their rightful legal recourse.  Absent a class action, Class Members will continue to incur harm without remedy.

80.     Moreover, prosecuting separate actions by individual Class Members would create a risk of (A) inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Stone Hill and Tug Hill and/or (B) adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

81.     The Shields know of no difficulty that will arise in the management of this litigation that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### Count I

### Fraud/Misrepresentation

82.     The Shields incorporate the preceding paragraphs of this Complaint as though fully stated here.

83.     Stone Hill and Tug Hill, independently and acting in concert, negligently and/or fraudulently misrepresented and/or failed to disclose material facts to the Shields, and the putative Class, which each had a duty to disclose prior to the purchase by Stone Hill of their mineral interests or rights, including, but not limited to, the following:

a.   Failing to disclose the relationship between Sone Hill and Tug Hill;

b.   Failing to disclose that confidential information relating to its lessors in West Virginia, the production from and production plans for its lessors' Leases in West Virginia, the virtual certainty of production and payment under the leases, and amount of royalties

20

relating to its lessors' Leases in West Virginia was provided by Tug Hill to its undisclosed affiliated company, Stone Hill;

c.  Failing to disclose Tug Hill's drilling program to Plaintiffs, all the while, upon information and belief, providing said information to Stone Hill;

d.  Failing to disclose information about royalties held in suspense by Tug Hill, thus misrepresenting the effective amount of consideration being paid;

e.  Purposefully creating the impression and factual pre-text of a legitimate, arms-length transaction when in reality Stone Hill had "insider information";

f.  Failing to disclose Tug Hill's method of calculating royalties;

g.  Failing to disclose that Tug Hill was improperly deducting costs and thereby reducing royalties owed;

h.  Failing to disclose the claims asserted in the Southern Country Lawsuit and that the Plaintiffs would be entitled to additional monies;

i.  Failing to disclose that Stone Hill was taking assignment of the claims in the Southern Country Lawsuit; and

j.  Other misrepresentations that will be shown at the trial of this matter.

84.   Had the Shields, and the putative Class, been provided the foregoing information, they would not have sold their mineral rights or interests or would have sold them for a higher price. In the alternative, the Shields, and the putative Class, reasonably and justifiably relied on these misrepresentations to their detriment and were damaged as a result.

**WHEREFORE**, the Shields, and the putative Class, demand all damages in law or equity, to which they are entitled, including past, present and future royalties/compensatory damages, punitive damages, pre-judgment interest, post-judgment interest and attorneys' fees.

21

## Count II

### Tortious Interference

85.     The Shields incorporate the preceding paragraphs of this Complaint as though fully stated here.

86.     Stone Hill acquired confidential information maintained by Tug Hill relating to its lessors in West Virginia, the production from and production plans for its lessors' Leases in West Virginia and royalties relating to its lessors' Leases in West Virginia, all without the consent or knowledge of its lessors, including the Shields.  Stone Hill acquired this confidential information for the intentional purpose of acquiring mineral interests and rights from the Shields, and the putative Class members, who had existing mineral leases with Tug Hill at a price substantially lower than their value and partially subsidized by royalties due and owed to the Shields, and the putative Class members.  Had the Shields, and the putative Class, been aware that Stone Hill was in possession of such confidential information and/or been provided the confidential information, they would have not sold their mineral rights or interests or would have sold them for a higher price.

87.     Accordingly, the Shields, and the putative Class, had existing contractual and business relationships and expectancy with Tug Hill with which Stone Hill internationally interfered, causing damage to the Shields, and the putative Class.

**WHEREFORE**, the Shields, and the putative Class, demand judgment in an amount to be determined along with all other appropriate damages in law or equity, to which they are entitled, including past, present and future compensatory damages, punitive damages, pre-judgment interest, post-judgment interest and attorneys' fees.

## Count III

### Breach of Fiduciary Duty

88.    At all relevant times prior to the sale of mineral rights and/or interests to Stone Hill, Tug Hill held royalties which were due and owing to the Shields, and the putative Class, for production from their Leases "in suspense."  Tug Hill provided information to Stone Hill regarding the royalties held in suspense without the consent or knowledge of the Shields, or the putative Class, which allowed Stone Hill to use this "insider information" to effectively purchase their mineral rights and interests with Plaintiffs' own suspended royalties payments.

89.    Had the Shields, and the putative Class, been aware of the royalties held "in suspense," they would not have sold their mineral rights and/or interests or, alternatively, would have obtained a higher price and/or retained their royalties held "in suspense."

**WHEREFORE**, the Shields, and the putative Class, demand judgment in an amount to be determined along with all other appropriate damages in law or equity, to which they are entitled, including past, present and future compensatory damages, punitive damages, pre-judgment interest, post-judgment interest and attorneys' fees.

### Count IV

### <u>Unjust Enrichment</u>

90.    The Shields incorporate the preceding paragraphs of this Complaint as though fully stated here.

91.    Stone Hill is liable under a theory of unjust enrichment to the extent it was able to acquire mineral interests or rights from the Shields and the putative Class through the use of non-disclosed internal information improperly obtained from its affiliate, Tug Hill, prior to purchasing the Shields' and the putative Class' mineral interest.

92.    Stone Hill's conduct as alleged herein was done in a willful and wanton manner intentionally calculated to cause harm to the Shields and the putative Class.

**WHEREFORE**, the Shields, and the putative Class, demand judgment in an amount to be determined along with all other appropriate damages in law or equity, to which they are entitled, including past, present and future compensatory damages, punitive damages, pre-judgment interest, post-judgment interest and attorneys' fees.

## Count V

## <u>Conspiracy</u>

93.     The Shields incorporate the preceding paragraphs of this Complaint as though fully stated here.

94.     At all relevant times, Stone Hill and Tug Hill conspired with each other and acted in concert to enable Stone Hill, Tug Hill's affiliate, to acquire mineral rights and/or interests from the Shields, and the putative Class, at less than their true value and subsidized by royalties belonging to the Shields, and the putative Class, held in trust and to entice the Shields, and the putative Class, to sell their mineral rights and/or interests to Stone Hill at less than their true value.  The acts and omissions taken in furtherance of this conspiracy, include the following:

a.  Tug Hill providing Stone Hill with access to confidential information relating to Tug Hill's lessors in West Virginia, the production from and production plans for its lessors' Leases in West Virginia and royalties relating to its lessors' Leases in West Virginia;

b.  Failing to disclose that Stone Hill had acquired confidential information from Tug Hill relating to Tug Hill's lessors in West Virginia, the production from and production plans for its lessors' Leases in West Virginia and royalties relating to its lessors' Leases in West Virginia;

c.  Failing to disclose the relationship between Sone Hill and Tug Hill;

24

    d.   Failing to disclose information about royalties held in suspense by Tug Hill and/or misrepresenting the effective amount of consideration being paid; and

    e.   Other acts and omissions that will be shown at the trial of this matter.

95.    But for the foregoing acts and omissions by Stone Hill and Tug Hill acting in concert, the Shields, and the putative Class, would not have sold their mineral rights or interests or would have sold them for a higher price.

    **WHEREFORE**, the Shields, and the putative Class, demand judgment in an amount to be determined along with all other appropriate damages in law or equity, to which they are entitled, including past, present and future compensatory damages, punitive damages, pre-judgment interest, post-judgment interest and attorneys' fees.

### Count VI

### Breach of Mineral Deed

96.    The Shields incorporate the preceding paragraphs of this Complaint as though fully stated here.

97.    The Mineral Deed executed by the Shields was drafted by Stone Hill.

98.    The Mineral Deed executed by the Shields is a form deed which is identical or substantially similar in substance to the Mineral Deeds executed by the putative Class members and which was also drafted by Stone Hill.

99.    The Mineral Deed executed by the Shields and the putative Class is ambiguous.

100.    Stone Hill breached the Mineral Deed by failing to pay the royalties due for oil and gas produced from the Leases for those months prior to the date of the Mineral Deed.

**WHEREFORE**, the Shields, and the putative Class, demand judgment in an amount of the royalties due for oil and gas produced from the Leases for those months prior to the date of the Mineral Deed and all other appropriate damages in law or equity, to which they are entitled.

## IX.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, the Shields, and the putative Class, demands judgment in their favor for:

A. An Order certifying the class(es) proposed by the Shields, naming the Shields as class representative, and appointing the Shields' counsel as class counsel;

B. Damages as prayed for herein and as allowed by law or equity;

C. Punitive Damages as allowed by law;

D. Pre-judgment and post-judgment interest as allowed by law;

E. Any and all other relief this Court deems appropriate and to which the Shields, and the putative Class, are entitled, including attorney's fees.

The Shields assert their right to a JURY for all issues.

PLAINTIFFS
By Counsel

/s/Mark A. Kepple
Mark A. Kepple, Esq.
W.Va. Bar ID #7470
1219 Chapline Street
Wheeling, WV 26003
Phone (304)233-3100
Fax (304) 233-0201
mkepple@baileywyant.com

Thomas E. White, Esq.
White Law Office
604 6th Street
Moundsville, WV 26041

Robert L. Redfearn, Jr. Esq.
Simon, Peragine, Smith & Redfearn

1100 Poydras St. #3000
New Orleans, LA 70163
*Pending Pro Hac Vice Admission*

Joseph Scipione, Esq.
The Nittany Group
169 Gerald St, Suite 110
State College, PA 16801
*Pending Pro Hac Vice Admission*